IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARKO J. LYMPEROPULOS, II, | ) |
| Plaintiff, | ) |
| v. | ) No. 09 C 1388 |
| MICHAEL J. ASTRUE, | ) Judge Nan R. Nolan |
| Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Marko J. Lymperopulos, II claims that he is disabled due to injuries he sustained in a car accident. He filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed cross-motions for summary judgment. For the reasons set forth here, the Commissioner's motion is granted and Plaintiff's motion is denied.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on January 25, 2006, alleging that he became disabled on April 21, 2005 due to multiple left leg and hip injuries, including a fractured acetabular (pelvic) bone, hip dislocation, fractured tibial plateau,[1] fractured knee cap, torn meniscus ligament[2] and leg compartment syndrome.[3] (R. 91, 146.) The application was denied initially on May 17, 2006, and

---

[1] The "tibial plateau" is the top of the shin bone. (http://orthopedics.about.com/od/brokenbones/a/tibia_2.htm.)

[2] "Torn meniscus" means a tear of the cartilage in the knee. (http://www.medicinenet.com/torn_meniscus/page2.htm.)

[3] "Compartment syndrome" is characterized by swelling and increased pressure that "presses on and compromises blood vessels, nerves, and/or tendons."

again on reconsideration on September 5, 2006. (R. 87-91, 93-96.) Plaintiff appealed the decision and requested an administrative hearing, which was held on October 17, 2007. Shortly thereafter, on March 28, 2008, Administrative Law Judge Maren Dougherty (the "ALJ") found that Plaintiff was disabled during the closed period of April 21, 2005 through March 31, 2007, but that he retains the residual functional capacity to perform sedentary work as of April 1, 2007. (R. 78, 83.) The Appeals Council denied Plaintiff's request for review on January 28, 2009, and he now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

**FACTUAL BACKGROUND**

Plaintiff was born on July 27, 1969 and was 38 years old at the time of the ALJ's decision. (R. 153.) He has a high school education and has worked as a journeyman carpenter, masonry worker and unloader. (R. 147, 150, 156.)

**A.   Medical History**

On April 21, 2005, Plaintiff sustained left hip and leg fractures in a car accident. Michael D. Stover, M.D. performed open reduction and internal fixation surgery to repair Plaintiff's hip on April 22, 2005. (R. 233-38, 296-98.) Dr. Stover performed additional surgical procedures to repair Plaintiff's leg on April 28 and May 9, 2005, including open reduction and internal fixation of the left tibial plateau fracture. (R. 239-40, 294-95.) Following his discharge on May 17, 2005, Plaintiff started physical therapy and recovered well from his hip injury, but he experienced continuing discomfort in his leg. In December 2005, Dr. Stover observed "some narrowing laterally" in the left knee, and expressed concern that such a condition had appeared "this early on in the postoperative course." (R. 211-17, 221.) A few months later in March 2006, Dr. Stover determined that Plaintiff might benefit from a knee osteotomy, a surgical procedure to add or remove bone from the upper shinbone to help shift body weight off the damaged portion of the knee joint. (R. 218, 303;

(http://www.medterms.com/script/main/art.asp?articlekey=11930.)

2

http://www.mayoclinic.com/health/knee-osteotomy/MY00710.)  Dr. Stover indicated that the procedure might improve Plaintiff's overall limb alignment and "hopefully improve the longevity of the knee as well."  Plaintiff said that he would think about the option.  (R. 218, 286.)

On June 15, 2006, Plaintiff returned to Dr. Stover complaining of pain, popping and clicking in his knee.  Dr. Stover observed tenderness and loss of lateral joint space, and diagnosed post-traumatic arthrosis of the knee that caused daily pain and limitation.  He referred Plaintiff to William Hopkinson, M.D., who had more experience with knee injuries in younger patients.  (R. 284-85.)  During an examination on August 28, 2006, Dr. Hopkinson observed that Plaintiff exhibited an antalgic limp favoring his left leg, and irregularities on the articular surface.  Plaintiff complained of numbness in his knee and foot and reported taking Excedrin and one to two tablets of Norco[4] each day for pain.  Dr. Hopkinson diagnosed "[p]ost traumatic arthritis . . . with soft tissue pain and possible mechanical derangement," and recommended an arthroscopic evaluation of the knee and removal of some of the surgical screws.  Dr. Hopkinson also gave Plaintiff a steroid injection, which helped to reduce his pain.  (R. 282-84.)

On September 21, 2006, Dr. Hopkinson performed the arthroscopic evaluation of Plaintiff's left knee, which revealed "several loose bodies and chondromalacia."[5]  (R. 280-82.)  Dr. Hopkinson removed the loose bodies and shaved the "articular cartilage in the lateral tibial plateau, the medial femoral condyle, and the patella."  (R. 281.)  During a follow-up examination on October 2, 2006, Dr. Hopkinson advised that if Plaintiff did not achieve dramatic pain relief, "he could consider proceeding with a varus producing distal femoral osteotomy."  (R. 280.)

---

[4] "Norco," a combination of acetaminophen and hydrocodone, "is used to relieve moderate to severe pain."  (http://www.drugs.com/norco.html.)

[5] "Chondromalacia" results from "damage to the cartilage which covers the posterior aspect (back) of the patella (knee cap)." (http://www.sportsinjuryclinic.net/cybertherapist/front/knee/indexcmp.php.)

3

On February 21, 2007, Plaintiff returned to Dr. Stover complaining of pain, catching in his knee and stiffness. (R. 370.) Dr. Stover opined that Plaintiff "would benefit from an, at least, attempted knee salvage with an osteotomy and arthroscopy," and noted that Plaintiff was "getting his disability paperwork for that." (*Id*.) Dr. Stover recommended that Plaintiff receive another steroid injection and check back in a couple of months regarding the osteotomy. (*Id*.)

Also on February 21, 2007, Dr. Stover completed a Physical Residual Functional Capacity Questionnaire on Plaintiff. (R. 344-47.) Dr. Stover noted that Plaintiff suffered from left knee pain, locking and swelling, with sharp, constant pain that increased with movement. (R. 344.) Dr. Stover opined that Plaintiff was incapable of performing even low stress jobs and could not walk a single block without rest or severe pain. In addition, Plaintiff could only sit for 30 minutes at a time and stand for 20 minutes at a time, and he needed to use a cane to walk. (R. 345-46.) In his Physician's Report for the State of Illinois Department of Human Services dated the same day, Dr. Stover found Plaintiff to have more than 50% reduced capacity in walking, bending, standing, stooping and sitting, and in performing physical activities of daily living. (R. 356.)

Radiographs taken on May 9, 2007 showed "improvement of previously seen depression of the lateral tibial plateau," and increased "moderate joint effusion" (*i.e.*, fluid in the knee) compared with a prior August 28, 2006 examination. (R. 371.) The following month, Plaintiff went to the Centegra Health System emergency room complaining of moderate pain in his left knee due to a recent fall. (R. 362-63.) He also complained of numbness in his left foot. (R. 365.) X-rays revealed "well healed tibial plateau fracture," "[d]egenerative changes lateral tibial plateau," and "[n]o acute disease." (R. 364.) The doctor instructed Plaintiff to elevate his left foot, refrain from placing weight on it, and consult a physician if he experienced any further problems. (R. 367.)

On December 27, 2007, Plaintiff saw Dr. Stover for "significant" pain and stiffness in his knee. (R. 374.) Plaintiff reported that he continued taking a narcotic each day along with anti-inflammatories. Dr. Stover observed "some swelling about the knee but no knee effusion," and

4

diagnosed "[p]ost traumatic joint arthritis." He discussed with Plaintiff the differences between total joint replacement and osteotomy, and noted that the osteotomy "may be less reliable with the decreased arc of motion as well as with his post traumatic arthrosis of the lateral joint space." (*Id*.) Dr. Stover further explained Plaintiff's options with respect to total knee arthroplasty. (*Id*.) A radiograph taken the same day showed "narrowing of the lateral knee joint space" and "a mild left genu valgus deformity." (R. 376.) Records from Loyola Medicine reflect that as of January 2008, Plaintiff was still taking Norco and Excedrin for pain. (R. 379.)

**B.     Plaintiff's Testimony**

Plaintiff testified that he has constant pain in his knee, and he takes one Norco and four to five Advil or Excedrin each day "to keep the pain at . . . a comfortable level." (R. 20-21.) When Plaintiff does not take the medication, his pain is at level six. With the Norco, however, his pain goes down to a level four for two to three hours, after which he supplements with over-the-counter drugs. (R. 22-23.) Plaintiff told the ALJ that he does not take the Norco at the same time every day, but waits until he needs it most, which is usually after lunch. (R. 58-59.) He does not like taking Norco because it makes him feel dizzy and a little lightheaded for about an hour, and he has trouble focusing, but taking Advil or Excedrin alone only reduces his pain to level five. (R. 25-26, 50.) Plaintiff confirmed, however, that he is able to function during the first hour on Norco, but just "feel[s] different." (R. 26-27.)

At the time of the hearing, Plaintiff had lived alone in a two-story condominium for a year and was able to climb the stairs one at a time. (R. 28-30.) He is capable of doing some light dusting and vacuuming, laundry and microwave cooking, and he goes grocery shopping every seven to ten days to purchase small items. He also reported getting six to eight hours of uninterrupted sleep each night. (R. 30-33.) When Plaintiff moved into the condominium, he was able to carry lighter boxes for about an hour at a time. (R. 37.)

5

Plaintiff told the ALJ that he can sit in a fixed position for an hour and a half before needing to get up and move around, and stand for less than an hour at a time. (R. 33.) He also indicated that he might be able to sit for six hours straight, explaining that "[w]ith pain medication I guess anything would be possible." (R. 49.) Plaintiff testified further, however, that he needs to get up and move around and is "always up and down during the course of the day sitting and standing to wherever I feel comfortable." (R. 48.) He also rubs his leg whenever it bothers him. (R. 68.) Plaintiff has a cane but does not like to use it; without the cane, he can walk for a block before needing to stop for a couple minutes to bend and rub his knee. (R. 33-35.) Plaintiff described his typical day as watching television for a couple hours; running errands; visiting with friends and family; and playing videogames. He likes to sit in a reclining chair because his leg feels more comfortable in a "fixed flat position" and is "best when it's straight." He is able to drive, and he helps his sister with minor repairs around her house, such as hanging blinds. (R. 37-42, 45-46.)

With respect to additional surgeries, Plaintiff acknowledged that his doctors have been discussing the possibility of performing a distal femoral osteotomy for some time, but indicated that he does not like "going under" anesthesia for surgery. (R. 27-28.)

**C.     Vocational Expert Testimony**

William M. Neuman testified at Plaintiff's hearing as a vocational expert ("VE"). The ALJ described a hypothetical person of Plaintiff's age, education and vocational background, who could occasionally lift 20 pounds; frequently lift 10 pounds; stand and walk for no more than two hours in an eight-hour workday; sit for six hours in an eight-hour workday with his leg stretched out; but never climb or crawl. The VE testified that such an individual could not perform Plaintiff's prior work as a carpenter because he would be limited to sedentary positions. (R. 63.) The VE identified 12,840 sorter jobs and 43,881 bench assembler jobs available to this person in the Chicago area. (R. 63-64.) He confirmed that these jobs are consistent with the Dictionary of Occupational Titles and require the use of both hands on a frequent but not constant basis. (R. 66, 67, 69.)

6

If the same individual needed a sit/stand option, the bench assembler jobs would remain available "[a]s long as [he was] not constantly getting up, down, up, down." (R. 65.) The VE explained that if this person needed to switch positions every 15 to 30 minutes, that would be acceptable. (*Id*.) If the individual needed to elevate his leg to "hassock height,"[6] however, then there would not be any jobs available to him. (*Id*.)

**D.    The ALJ's Decision**

The ALJ found that Plaintiff's acetabular and left tibial plateau fractures are severe impairments, but that they do not alone or in combination meet or equal those listed in the Social Security Regulations. (R. 81.) The ALJ determined that from April 21, 2005 through March 31, 2007, Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, "except that he could not sustain any position or combination of positions for an eight hour day." (R. 82.) There are no jobs available to someone with such a restriction, so Plaintiff was disabled during that closed period. (R. 82-83.)

The ALJ found that since April 1, 2007, however, Plaintiff has been capable of performing sedentary work as long as he can extend his left leg and sit or stand as needed. (R. 83.) In reaching this conclusion, the ALJ noted that Plaintiff can sit for an hour and a half before needing to change positions, and that with the aid of medication, he can sit for six hours in an eight-hour day. He is also able to care for himself in a two-story condominium, including shopping, cleaning and even carrying lighter boxes. (R. 84.) The ALJ acknowledged Dr. Stover's February 21, 2007 assessment that Plaintiff's ability to sit, stand and walk was reduced by 50%, but she also noted that Dr. Stover completed this report "[i]n anticipation of a determination of the claimant's eligibility for medical assistance." (*Id*.)

---

[6]    A hassock is a "low stool that serves as a seat or leg rest." (http://www.merriam-webster.com/dictionary/hassock.)

The ALJ accepted that Plaintiff experiences residual pain, but found that the pain is not completely debilitating. By Plaintiff's own admission, the Norco and Excedrin/Advil provide several hours of relief. In addition, a sedentary RFC does not require Plaintiff to perform activities that aggravate his pain. (R. 85.) As for Dr. Stover's February 2007 opinion that Plaintiff cannot work at all until sometime in 2008, the ALJ rejected this assessment, noting that it "is too speculative, seems predicated upon the hope that additional surgery will take place, and is belied by the claimant's own description of his functional abilities." (*Id*.)

## DISCUSSION

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "'lacks evidentiary support or is so poorly

articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)).

**B.     Five-Step Inquiry**

To recover DIB under Title II of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act.  42 U.S.C. § 423(d); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009).  A person is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id*.; *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at *14 (N.D. Ill. Sept. 16, 2009).  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?  (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.     Analysis**

In support of his request for a reversal and remand, Plaintiff argues that the ALJ failed to consider testimony from the VE that supported a finding of disability; erred in finding that he had medically improved as of April 1, 2007; and made an improper credibility determination.  The court addresses each argument in turn.

**1.     The VE's Testimony**

Plaintiff first objects that the ALJ improperly ignored VE testimony demonstrating that he cannot perform any jobs available in the economy. (Pl. Mem., at 7.)  The VE testified that a person who needs to alternate between sitting and standing can perform sedentary work as long as he

9

switches position no more than every 15 to 30 minutes. (R. 65.) The ALJ found, however, that Plaintiff must be able to sit or stand "as needed." As Plaintiff sees it, the "as needed" language "contemplates the possibility that Plaintiff would be unable to maintain one position for 15-30 minutes." (Pl. Mem., at 7.) The court disagrees.

The Seventh Circuit recently explained that "[c]hanging positions 'as needed' allows an employee broad flexibility and thus has a more restrictive effect on the jobs available." *Ketelboeter*, 550 F.3d at 626. Here, however, Plaintiff testified that he is able to sit in a fixed position for an hour and a half before needing to get up and move around. (R. 33.) He also stated that with pain medication, he might be able to sit for six hours straight. (R. 49.) Notably, Dr. Stover found in February 2007 that Plaintiff could sit for 30 minutes at a time before needing to get up. On these facts, the ALJ reasonably concluded that Plaintiff can perform jobs allowing for a position switch every 15 to 30 minutes, as described by the VE. (R. 84.) *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (the ALJ need not mention every piece of evidence but must build an "accurate and logical bridge" between the evidence and the conclusion that the claimant is not disabled).

Plaintiff also argues that the ALJ failed to consider how he can perform sedentary work despite needing to elevate and rub his leg for the majority of the day. (Pl. Mem., at 7, 8.) The VE did testify that there are no jobs available to a person who needs to elevate his leg to hassock height, but there is no evidence that Plaintiff has such a medical restriction. As noted, Plaintiff testified repeatedly that he can sit in a regular chair for an hour and a half before needing to move around. (R. 45-47.) He prefers to keep his leg elevated, but there is no medical evidence that this is required. To the contrary, Dr. Stover found such a limitation not applicable in February 2007. (R. 345-46.) In addition, the ALJ allowed for Plaintiff to stretch his leg out while seated. (R. 83.) On these facts, the ALJ did not err in failing to include leg elevation in Plaintiff's RFC. *See, e.g., Ridinger v. Astrue*, 589 F. Supp. 2d 995, 1008 (N.D. Ill. 2008) (in absence of medical

recommendation that claimant elevate his leg, "substantial evidence supported the ALJ's finding that [the claimant] did not need to elevate his leg during the day.")

Nor did the ALJ improperly ignore Plaintiff's need to rub his leg. Plaintiff testified that he does not know how often he rubs his leg, or for how long. As Plaintiff explained, "[t]here is no set time" and "I don't have a time limit on it." (R. 68.) Contrary to Plaintiff's assertion, the VE did not testify that the sedentary jobs he identified require the use of both hands "at all times." (Pl. Mem., at 7-8.) Rather, the jobs require frequent but not constant use of both hands. (R. 67, 69.) Nothing in Plaintiff's testimony or medical records is inconsistent with his ability to use his hands often enough to perform sedentary work.

    **2.**    **Medical Improvement**

Plaintiff next objects that the ALJ erred in finding him medically improved as of April 1, 2007. Medical improvement is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A finding of decreased medical severity must be based on "changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairment(s)." *Id.*; *Platt v. Astrue*, No. 4:08-cv-57-PPS, 2009 WL 4545149, at *6 (N.D. Ind. Nov. 30, 2009). When, as here, the ALJ finds the claimant disabled for a closed period in the same decision in which she finds medical improvement, the severity of the claimant's current medical condition is compared to the severity of the condition as of the disability onset date. *Koslow ex rel. Koslow v. Astrue*, No. 2:08-cv-159-PRC, 2009 WL 1457003, at *11 (N.D. Ind. May 22, 2009).

To determine whether medical improvement has occurred, the ALJ engages in an eight-step inquiry: (1) Is the claimant engaged in substantial gainful activity?; (2) If not, does the claimant have an impairment or combination of impairments which meets or equals the severity of a listed impairment?; (3) If not, has there been a medical improvement?; (4) Is the medical improvement

11

related to the claimant's ability to do work?; (5) Do any exceptions to medical improvement apply? (6) Are the claimant's current impairments severe in combination?; (7) If so, can the claimant perform his past relevant work?; (8) If not, can the claimant do other work given his residual functional capacity, age, education and work experience? 20 C.F.R. § 404.1594(f); *Platt*, 2009 WL 4545149, at *5.

The ALJ noted that there was "no bright line of demarcation in the treatment records," but found that Plaintiff had medically improved "based on the claimant's admission during his testimony as to the degree of his residual limitation." (R. 83.) Specifically, Plaintiff testified that he can sit for an hour and a half, which the ALJ viewed as "a significant degree of improvement in his functioning." (*Id*.) The ALJ acknowledged that in February 2007, Dr. Stover opined that Plaintiff had a more than 50% reduction in his ability to walk, stand, sit and perform daily activities; could only sit for 30 minutes and stand for 20 minutes at a time; and could not maintain an eight-hour workday. (R. 82, 83, 356.) The ALJ expressed some reservation, however, that the opinion was made "to assist the claimant in accessing medical assistance, which he needed in order to proceed with the second knee surgery." (R. 82.) *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (quoting *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.") Indeed, Dr. Stover went so far as to say that Plaintiff could not handle even "low stress" jobs, though as the ALJ noted, Dr. Stover is an orthopaedic surgeon and not a psychiatrist, he made no finding of clinical depression, and there is no evidence whatsoever of any independently limiting mental impairment. (R. 81, 345.)

In any event, the ALJ accepted Dr. Stover's assessment "as of the date the opinion was given," but concluded that it did not reflect Plaintiff's functioning after that date. (R. 82.) In the ALJ's view, Dr. Stover's opinion that Plaintiff would be unable to work until February 2008 was "too speculative, seems predicated upon the hope that additional surgery will take place, and is belied

12

by the claimant's own description of his functional abilities." (R. 85, 344.) Plaintiff finds it significant that Dr. Stover continued to discuss surgical options after April 1, 2007. To be sure, the record reflects that Dr. Stover believed Plaintiff "would benefit from" an osteotomy or other surgical intervention, and discussed these options with him on several occasions. In fact, Dr. Stover first mentioned the possibility of an osteotomy in March 2006. (R. 218, 370, 374.) Plaintiff, however, was resistant to the idea of having more surgery. He chose to have an arthroscopic evaluation instead, and still would not commit to an osteotomy in February 2007. In addition, Plaintiff waited more than 10 months before returning to see Dr. Stover in late December 2007 – though Dr. Stover wanted Plaintiff back in "a couple of months" – and he remained uncertain about surgery at that time. (R. 370, 374.) This is consistent with Plaintiff's testimony at the hearing before the ALJ:

> Q: Now what I'm hearing you say is that they're contemplating some intermediate surgery.
>
> A: Yes, reconstructing my –
>
> Q: Not a total knee replacement, but something else more tailored to what they see based on that scan.
>
> A: Yes. They were talking about a distal femoral osteotomy.
>
> Q: Yeah. They've been talking about that throughout, right?
>
> A: Yeah. And I don't know if I want to do that if it's not . . . something permanent and I really don't like going under . . . surgery aspect.

(R. 27-28.) Notably, Dr. Stover never said that Plaintiff would be unable to work again without surgery. To the contrary, he consistently expressed concern that Plaintiff would not be able to return to his past work as a carpenter. (R. 216, 218.)

With respect to Plaintiff's functional abilities, he repeatedly testified that he can sit for an hour and a half at a time before needing to move; that his pain medication provides several hours of relief; and that he is able to function while on the pain medications. He also testified that he can shop, drive, walk a block, visit friends and family, use a computer, play videogames and watch t.v.

(R. 84.) This is contrary to Dr. Stover's opinion that Plaintiff's pain would "constantly" interfere with his ability to concentrate and maintain attention. (R. 345.)

Plaintiff argues that medical improvement cannot be based solely on his testimony, but must appear in the form of a medical diagnosis. "Medical improvement is . . . determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)." 20 C.F.R. § 404.1594(c)(1). *See also Yousif v. Chater*, 901 F. Supp. 1377, 1385 (N.D. Ill. 1995) ("[M]edical improvement must be based not on a single report as such, but rather on a comparison between the medical report or reports that reflect an allegedly 'improved' claimant and the medical reports at the time of the most recent favorable decision of disability.") Here, the medical records all reflect that Plaintiff achieved significant improvement compared to his medical condition as of his April 21, 2005 disability onset date. *Koslow ex rel. Koslow*, 2009 WL 1457003, at *11.

In February 2007, for example, Dr. Stover observed that Plaintiff's wounds "are well healed," and that he "does not really have any demonstrable deformity." He was "stable to varus and valgus[7] stress and full extension," with only "a little bit of valgus overall." Dr. Stover stated that Plaintiff's "neurovascular exam [was] intact," and observed that "[h]is knee range of motion is gently brought out to full extension and then about 95 degrees of flexion actively." (R. 370.) The ALJ noted Plaintiff's May 9, 2007 x-ray, which revealed "healing fracture of the lateral tibial plateau"; "alignment unchanged, with improvement of previously seen depression of the lateral tibial plateau"; and only "moderate joint effusion." (R. 85, 371.) The ALJ also mentioned Plaintiff's June 2007 fall and visit to the emergency room, where x-rays showed "well healed tibial plateau fracture" and "[n]o acute disease." (R. 85, 364.) In December 2007, Dr. Stover again observed that

---

[7] "Varus" means bow legged; "valgus" means knock-kneed. (http://www.merckmedicus.com/ppdocs/us/hcp/diseasemodules/osteoarthritis/figures/figure19.html.)

Plaintiff's incision was "well healed," and the knee showed some swelling but no effusion. Plaintiff still had about 95 degrees of knee flexion and his neurovascular exam was intact. He did exhibit some tenderness in the lateral joint space, but only minimal tenderness medially." (R. 374.)

Plaintiff also objects that the ALJ based her finding of medical improvement in part on speculation as to "the expected length of post-operative recovery time." (R. 83.) Specifically, the ALJ "presum[ed]" that it took Plaintiff six months to recover from his September 21, 2006 surgery with Dr. Hopkinson. (R. 82.) Plaintiff is correct that "[s]peculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence." *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999). Notwithstanding the ALJ's poor word choice, however, the medical record discussed above does support the conclusion that Plaintiff had recovered from his second surgery by at least April 2007. The ALJ's finding that Plaintiff's condition medically improved such that he can perform sedentary work is supported by substantial evidence. *See Platt*, 2009 WL 4545149, at *7 (upholding finding of medical improvement where the ALJ "identif[ied] evidence of medical improvement that a reasonable mind might accept as adequate to support a conclusion.")

### 3. Credibility

Plaintiff finally seeks remand based on the ALJ's credibility determination. In assessing a claimant's credibility when the allegedly disabling symptoms (such as pain or fatigue) are not objectively verifiable, an ALJ must first determine whether those symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold*, 473 F.3d at 823 (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)). *See*

*also* 20 C.F.R. § 404.1529. The ALJ must provide specific reasons for the credibility finding, but hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). A credibility determination is patently wrong only when it "lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 13-14 (7th Cir. 2008).

Plaintiff first argues that the ALJ failed to make an explicit credibility determination as required by SSR 96-7p. The court disagrees. The ALJ extensively discussed the medical evidence and Plaintiff's testimony regarding his symptoms, daily activities and functional limitations. (R. 83-85.) She accepted that Plaintiff has residual pain based on his use of narcotic and over-the-counter medications, but she concluded that the pain is "not completely debilitating" based on Plaintiff's own admission that he "gets several hours of relief." The ALJ also noted that "activities that [Plaintiff] asserts aggravate his pain, such as movement, are not required under the residual functional capacity assessed herein." (R. 85.) The court is satisfied that the ALJ properly engaged in a credibility determination in this case. *See Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (in assessing credibility, an ALJ must look to "the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'")

Plaintiff also contends that because the ALJ accepted his testimony that he can sit for 90 minutes at a time, she erred in failing to also accept his testimony regarding dizziness, lightheadedness, difficulty focusing, constant knee pain and leg elevation. (Pl. Mem., at 12-13.) This theory is inconsistent with SSR 96-7p, which states that "[i]n making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements. SSR 96-7p, at *4. It is true that the ALJ did not mention every one of Plaintiff's complaints, but neither did she selectively choose only those that supported her conclusion. *See Cochrane v. Astrue*, No. 08 C 2906, 2009 WL 5173496, at *2 (N.D. Ill. Dec. 30,

2009) ("The ALJ . . . may not . . . discuss only the evidence that favors his or her decision.")  For example, the ALJ noted that Plaintiff can only walk for a block, and experiences left leg swelling, numbness and locking.  She also accommodated Plaintiff's restrictions in climbing stairs, standing, and walking by limiting him to sedentary work.  The ALJ explained that such restrictions are "consistent with the limitations arising from the difficulties typically associated with a bad knee."  (R. 85.)

Other statements that Plaintiff says support a finding of disability actually demonstrate his ability to work.  Plaintiff did testify that he experiences dizziness and lightheadedness when he takes Norco, but he also confirmed that these symptoms only last for about an hour, and that he remains able to function during that time.  (R. 26-27.)  Plaintiff also testified that he has trouble staying focused while looking at a computer screen, and that his difficulty concentrating is due to both pain and not feeling like himself.  (R. 45, 55.)  Yet he also watches television for a couple hours at a time and can follow one-hour shows that he finds interesting.  (R. 57-58.)  This is in addition to his ability to run errands, visit with friends and family, drive a car, play videogames and help his sister around the house.  Moreover, in explaining his statement about pain and concentration, Plaintiff mentioned only concerns about his future: "Uncertainty over the future, you know, I'm always constantly thinking, you know, how much more money can I borrow from my sister, you know, I got to pay bills.  Just life in general, just trying to function in society."  (R. 55.)

As for Plaintiff's testimony that he is "always moving," that his leg is "best when it's straight," and that he usually elevates it when at home, the ALJ reasonably accepted Plaintiff's repeated acknowledgment that notwithstanding these limitations, he can sit for 90 minutes at a time in a regular chair.  As noted, even Dr. Stover found leg elevation not applicable in Plaintiff's case.  The ALJ did not err in failing to specifically mention certain of Plaintiff's complaints, and the court cannot find that her credibility determination was "patently wrong."

**CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 18] is denied, and Defendant's Cross Motion for Summary Judgment [Doc. 25] is granted. The clerk is ordered to enter judgment in favor of Defendant.

ENTER:

Dated: March 10, 2010

NAN R. NOLAN
United States Magistrate Judge